UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:21-81391-CV-MIDDLEBROOKS

HUMAN RIGHTS DEFENSE CENTER,
        Plaintiff,
v.

RICKY D. DIXON, *et al.*,
        Defendants.
_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(c), Fed. R. Civ. P., Defendants DIXON, INCH, and COLON seek summary judgment because there is no dispute as to the material facts and they are entitled to judgment in their favor on all claims of Plaintiff Human Rights Defense Center ("HRDC").

## BACKGROUND

HRDC alleges that Defendants violated the First and Fourteenth Amendment by impounding several publications published or distributed by HRDC, and that Defendants failed to provide notice each time they impounded such publications. At issue is a part of the Florida Department of Corrections ("FDOC") Admissible Reading Material Rule, Fla. Admin. Code r. 33-501.401 ("ARM Rule"), which HRDC alleges is unconstitutionally vague and overbroad, both in its prior and current form. Section 15 of the ARM Rule limits the type of publications that can be received in the mail by inmates in FDOC custody and prohibits publications that include advertisements for activities or services that are the subject of other rules or laws applicable to FDOC inmates.[1]

_____

[1] Pursuant to Fla. Admin. Code r. 33-210.101(12), FDOC inmates are not allowed to place "ads soliciting pen pals," and Section 15(o)(2) of the Rule prohibits an inmate from receiving a publication that contains ads offering pen pal services. Similarly, pursuant to Fla. Admin. Code r. 33-210.101(22), inmates are not allowed to "use postage stamps as currency to pay for products

HRDC's challenge here, in Count I, to the version of the ARM Rule that was in effect until May 4, 2022, is an as-applied challenge that does not criticize the procedures provided in the rule, but rather how FDOC applied the ARM Rule and complied with those procedures.[2] To that extent HRDC has raised the same issues as in a prior First Amendment challenge brought unsuccessfully by HRDC under the same section of the ARM Rule (which was renumbered from section 3 to section 15 in June 2020). In *Prison Legal News v. Sec'y, Fla. Dep't of Corr.*, 890 F.3d 954 (11th Cir. 2018), the Eleventh Circuit affirmed Judge Walker's decision, in *Prison Legal News v. Jones*, 12cv239 (N.D. Fla.), and found that under the ARM Rule, specifically subsection (3)(l) (renumbered to 15(o)), FDOC was authorized to impound publications containing advertisements for activities or services which FDOC had a legitimate penological interest in restricting. HRDC's earlier lawsuit was only successful as to its claim that FDOC had not complied with the procedural due process provisions of the ARM Rule, and Judge Walker required that FDOC provide notice to HRDC the first time FDOC impounded one of HRDC's monthly *Prison Legal News* ("*PLN*") newsletters. *Prison Legal News*, 890 F.3d at 977. In compliance with Judge Walker's ruling, FDOC has done exactly that. Despite the Eleventh Circuit's ruling affirming that FDOC could properly impound HRDC's publications that

---

or services," and Section 15(o)(3) of the Rule prohibits admission of a publication that contains advertising that allows for the purchase of products or services with postage stamps.

**2** Am. Compl (ECF No. 39), ¶ 18 ("FDOC has applied these provisions"), ¶ 43 ("FDOC's arbitrary application of [ARM Rule"), ¶ 76 (Count Two) ("the implementation of [ARM Rule]"), ¶ 80 (Count Three) ("Applied here, [ARM Rule] has no legitimate application"), Prayer for Relief ("Declare that [ARM Rule], as applied to Plaintiff's publications") ¶ 80. *See also* HRDC's Response to Defendants' Motion to Dismiss (ECF No. 49), 11 ("HRDC argues that Defendants' actions here violated its constitutional rights through the arbitrary and unreasonable application of Defendants' own regulations."); Order (ECF No. 56), at 3 "Plaintiff … contends that the allegations here are based on a different application of a different regulation than the former lawsuit …), 11-12 (as to Counts Two and Three: "there are differences in the application of the regulation at issue in this case and in Prison Legal News").

contained prohibited types of ads, HRDC continues to publish the same or nearly the same ads as were at issue in the prior litigation – and now such ads appear in a new monthly publication, *Criminal Legal News* ("*CLN*"), that HRDC started publishing two years after Judge Walker entered his injunction regarding notice as to the PLN newsletter. To the extent that HRDC is bringing a facial challenge in Counts II and III (HRDC's pleading is unclear), based on an alleged vagueness or overbreadth, even after the ARM Rule was recently amended, HRDC has failed to meet the heavy burden of demonstrating that there are no set of circumstances under which the ARM Rule would be valid.

Finally, the evidence demonstrates that HRDC received an abundance of due process regarding its publications and its claim for punitive damages in this lawsuit against FDOC "for violating Plaintiff's due process rights in violation of the injunction" is baseless. First, HRDC received notice each time an HRDC publication was first impounded along with a list of reasons for the impoundment (specifically, HRDC admits receiving notice as to 57 of 58 issues of *PLN*).[3] Second, it is undisputed that each of those impoundment decisions promptly was reviewed by FDOC's Literature Review Committee ("LRC"), which is comprised of senior leadership at FDOC in the areas of security operations, education/programming, and policy management/inmate grievance appeals, pursuant to Fla. Admin. Code r. 33-501.401(22), to ensure that each publication was properly evaluated when impounded. Additionally, at all times HRDC had the opportunity to request the LRC to conduct a publisher's review of the impoundment decision, as provided in Fla. Admin. Code r. 33-501.401(23)(a), a publisher's review of the initial LRC decision, as provided in 33-501.401(24), or a Special Meeting, as

---

**3** HRDC admits that it received notice of 96.5% of the initial impoundments of its publications. Defendants sent the remaining 3.5% of notices, but HRDC denies they were received. *See* Defendants' Statement of Uncontested Material Facts ("Facts"), at ¶¶ 72-73.

provided in 33-501.401(25). HRDC never followed sections 23 or 24 or 25 of the ARM Rule even though it admits receiving notice of almost every impoundment over a five year period.[4] Despite HRDC's failure to follow the ARM Rule regarding requests for review, after this lawsuit was filed Secretary Inch requested a special meeting of the LRC, under section 25(b) of the ARM Rule, at which time every page of more than 100 monthly editions of PLN and CLN were reviewed by three Bureau Chiefs of FDOC who determined that each of the publications contained offending advertisements and was subject to impoundment. Facts, ¶ 92.

From the outset HRDC has overstated its case and failed to acknowledge evidence it possesses.[5] There is no basis for HRDC's claims, especially HRDC's claim for punitive damages or damages of any sort. In addition to bringing claims against Defendants Inch and Colon in their individual capacity, which the evidence shows are baseless since Defendant Colon was not even working at Dade or Everglades Correctional Institutions at the time he allegedly violated HRDC's rights at those facilities, HRDC identified several other defendants sued in their individual capacity but then never served them. Defendants have expended substantial resources to defend this case, and have responded to extensive and overbroad discovery requests, defended ten

---

[4] HRDC's Executive Director, Paul Wright, sent an email in February 2020 to Secretary Inch, asking to meet at an upcoming conference to discuss "FDOC's decades long censorship of HRDC's publications and ending it?" Facts, ¶ 85. Mr. Wright then sent a letter in April 2020 to the email address of the then-General Counsel of FDOC who left at approximately that same time, such that the letter was not received by anyone else at FDOC and not discovered until Mr. Wright mailed a letter addressed to Secretary Inch (not to the Library Services Administrator, as required by three different provisions of the ARM Rule) in March 2021, and attached a copy of the prior letter. Facts, ¶¶ 87-88. In the March 2021 letter, Mr. Wright claimed that the ads at issue in the earlier litigation were "virtually non-existent in current editions" of the newsletters and that HRDC's "books have no advertising at all." These statements are incorrect. Facts, ¶94.

[5] HRDC was aware of the penological interests at issue prior to filing: the nature of the advertising in HRDC's publications, that it had received nearly every notice of impoundment over the applicable statute of limitations, and that the LRC reviewed each of the impoundments. Facts, ¶¶ 72-73. Further, HRDC's Amended Complaint (ECF No. 39) ("Am. Compl.") includes multiple errors, *e.g.*, ¶¶ 28, 29, 31, and 87 all refer to incorrect exhibits or wrong dates.

depositions of FDOC leadership, and reviewed more than 16,000 pages of documents from HRDC. Defendants also have tried repeatedly to get HRDC to comply with its discovery obligations, including the obligation to make initial disclosures, to not make general objections on the basis of privilege and relevancy, and to respond to discovery requests seeking HRDC's basis for its damages claims. After this exhaustive and expensive discovery process, it is clear that there are no material facts in dispute and Defendants are entitled to judgment in their favor.

## MEMORANDUM OF LAW

### A.  HRDC's First Amendment rights were not violated by the ARM Rule

HRDC's Am. Compl describes conduct from as early as May 2017, while the parties were still litigating the prior case brought by HRDC as to the ARM Rule, *Prison Legal News*, 890 F.3d at 954. Indeed, the parties litigated the *same* language of the ARM Rule regarding the impoundment of publications that contain advertisements "for three-way calling services, pen pal solicitation services, or for conducting a business," and that are "the focus of, rather than being incidental to, the publication, or the advertising is prominent or prevalent throughout the publication." *Id* at 954, 960 (11th Cir. 2018), citing Fla. Admin. Code r. 33-501.401(3)(l) (renumbered in 2020 to subsection (15)(o)). The Eleventh Circuit held that FDOC's decisions to impound publications based upon ads, identical or nearly the same as those at issue in the present case, did not violate plaintiff's constitutional rights. *Id* at 890 F.3d at 976. HRDC now alleges that Defendants' refusal to deliver the subject publications "bears no connection with any legitimate state interest," and that rejection of specific publications constitutes a "de facto blanket ban of HRDC's speech" motivated solely "due to FDOC officials' disagreement with the content of those publications," such that Defendants applied the rules to "censor speech they disfavor politically." Am. Compl. at ¶¶ 64, 71. HRDC's current challenge to the ARM Rule as stated in

Count I of its pleading is again an "as applied" challenge. Am. Compl. (ECF No. 39), ¶¶ 14-16, 18.[6] To establish that HRDC's First Amendment rights were violated, HRDC must demonstrate that the ARM Rule is not "reasonably related to legitimate penological interests." In *Turner v. Safley*, 482 U.S. 78 (1987), the court identified four factors that define this inquiry: "(1) whether there is a 'valid, rational connection' between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an 'exaggerated response' to prison concerns." *Pope v. Hightower*, 101 F.3d 1382, 1384 (11th Cir. 1996) (quoting *Turner*, 482 U.S. at 89-91).

　　Two years after *Turner* was decided, the Supreme Court applied the standards discussed in *Turner*, and held that First Amendment Rights "must be exercised with due regard for the

---

**6** HRDC failed to discontinue ads for prisoner pen pal services describing them as one of HRDC's three "staple" or main advertising categories and relatively unchanging.  Facts at ¶ 61. It is not surprising then that ads for writeaprisoner.com and other pen pal services appearing in HRDC's publications are identical or nearly identical to those reviewed by Judge Walker and the Eleventh Circuit when reviewing HRDC's *PLN* newsletters. Facts, ¶¶ 61, 65. That some ads now appear in the *CLN* newsletters does not change the prior court's ruling that these ads are the type prohibited under FDOC's ARM Rule. Until the ARM Rule was recently amended, section 15(o) contained the same language as was evaluated by Judge Walker and the Eleventh Circuit (when the applicable provision of the ARM Rule was numbered 3(l)). Accordingly, as to this aspect of HRDC's pleading challenging FDOC's application of the ARM Rule until May 4, 2022, and as to the same categories of ads that were addressed in the *Prison Legal News* case, Defendant Dixon in his official capacity is entitled to the protections of res judicata and collateral estoppel. *See, Citibank, N.A. v. Delta Lease Financial Corp.*, 904 F.2d 1498, 1501 (11th Cir. 1990) (res judicata bars claims that were raised, or could have been raised, in prior litigation where parties are identical, the same cause of action is presented, and final judgment on the merits was rendered); *Lozman v. City of Riviera Beach, Fla.*, 713 F.3d 1066, 1080 (11th Cir. 2013) (collateral estoppel applies when "issue at stake is identical to the one involved in the prior proceeding and the issue was actually litigated and decided in the prior proceeding").

inordinately difficult undertaking that is modern prison administration." *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) (internal citations omitted). Federal courts follow a "unitary, deferential standard for reviewing prisoners' constitutional claims" that looks to whether a facility's regulation "'is reasonably related to legitimate penological interests.'" *Id.*, at 409, quoting *Turner*, 482 U.S. at 89. Courts must be "sensitive to the delicate balance that prison administrators must strike between the order and security of the internal prison environment and the legitimate demands of those on the 'outside' who seek to enter that environment, in person or through the written word" *Thornburgh*, 490 U.S. at 407. Prison administrators are due "'wide-ranging' and 'substantial' deference … because of the complexity of prison management, the fact that responsibility therefor is necessarily vested in prison officials, and the fact that courts are ill-equipped to deal with such problems." *Prison Legal News*, 890 F.3d at 965 (internal quotes omitted). Where a state correctional system is involved, "federal courts have … additional reason to accord deference to the appropriate prison authorities." *Turner*, 482 U.S. at 85.

HRDC claims that they were not given an explanation of reasons for the impoundment of the subject publications, but each notice HRDC received cited specific provisions of the ARM Rule as the basis for impoundment and the pages on which offending ads are found. That is all that is required to be provided to a publisher and these impoundment decisions are precisely the types of decisions where discretion is vested in prison officials. HRDC has argued that Defendants should not be able to impound a publication when it has only a single ad, and that the principles of *Thornburgh* would only permit such conduct if that single ad was "featured" in the publication. HRDC is incorrect. Under *Thornburgh*, *Turner*, and *Prison Legal News*, FDOC's decision to impound HRDC's publications on the basis of a single ad – which, notably, occurred only once in the past 5 years and was promptly overturned by the LRC, Facts, ¶ 79 - would be

entitled to "wide-ranging and substantial" deference because Defendants have the authority, and the responsibility, to apply their experience as corrections professionals and take into account current circumstances when reviewing each publication. The evidence here clearly demonstrates, and HRDC cannot dispute, that the threats posed by increasing use of contraband wireless devices has rendered certain types of prohibited activities much more accessible to inmates and, thus, ads for those types of activities properly can be found to be more of a threat than they might have been ten years ago. Facts, ¶¶ 10, 27-28, 30, 34-35, 45, 47, 57, 68.[7] Despite HRDC's longstanding concerns with the language in the ARM Rule, HRDC has never engaged in Florida's rulemaking process under Chapter 120 of the Florida Statutes, even though "[i]f PLN is not satisfied with the existing requirement of one notice for each impounded issue of Prison Legal News, then PLN can initiate rulemaking to change the frequency and extent of such notice." *Prison Legal News v. Crews (later Jones)*, No. 4:12CV239-MW/CAS, 2014 WL 11411829, at *24 n.22 (N.D. Fla. Aug. 11, 2014).[8]

Before turning to the application of the *Turner* standard, it is important to review the provisions of the ARM Rule. First, when a publication addressed to an inmate is received at one of FDOC's facilities, it is initially screened by trained staff who, upon discovering a violation of

---

**7** HRDC argued that the use of cell phones and social media by inmates was "irrelevant and not at issue" at that time. *Prison Legal News*, Case No. 12cv239 (N.D. Fla.), Plaintiff's Response to Defendant's Second Motion for Summary Judgment (ECF No. 153), at ¶ 10. Clearly, times have changed now that thousands of inmates in just the past few months used hacked tablets to access the internet and social media. Facts, ¶¶ 27-28.

**8** HRDC asserts that the previously described First Amendment claims additionally constitute a violation of the Due Process Clauses' substantive component. Am. Compl. (ECF No. 39), ¶99-102. However, as the Court held in *Eisenberg v. City of Miami Beach*, 54 F. Supp. 3d 1312, 1326 (S.D. Fla. 2014), "[t]o the extent Plaintiffs' substantive due process claim is based on a First Amendment violation it fails because a cause of action cannot be based in substantive due process where a more specific constitutional provision is applicable." As in *Eisenberg*, HRDC's substantive due process claims are based on the same allegations as their First Amendment claims and are subsumed by them since a more specific constitutional provision has been cited.

the ARM Rule, notify the Warden or Assistant Warden who then determine whether a publication should be impounded. Notice of the impoundment, on Form DC5-101, is sent to the inmate and to the publisher along with a description of how the publication violated the ARM Rule.[9] A copy of the offending publication along with the notice is sent to the LRC for review. At regularly scheduled meetings, the LRC members review each impounded publication to determine whether the impoundment decision was made in accordance with the plain language of the ARM Rule. The LRC either affirms or overturns the impoundment and their decision is final. Inmates have the right to file a grievance regarding the impoundment, and publishers have the right to seek review at the impoundment stage and again after the LRC decision, and publishers also can seek a third level of appellate review by asking for the Secretary of FDOC to convene a Special Meeting of the LRC. Fla. Admin. Code r. 33-501.401; Facts, ¶¶ 23-24, 80.

Defendants' implementation of the ARM Rule rejecting publications adverse to FDOC's penological interests, while providing notice to the publisher and inmate, is a reasonable practice which balances FDOC's penological interests and the rights of both the publisher and inmate.

### 1.  HRDC's claims do not meet the *Turner* standard

A prison regulation is valid if it passes the four-factor test set out in *Turner*. When balancing the *Turner* factors, a court must avoid substituting its judgment on matters of institutional administration for the determinations of those charged with formidable task of running a prison. Prison officials have the difficult task of determining when "certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison." *Thornburgh*, 490 U.S. at 407. The burden "is not on the

---

**9** In addition to the notice to HRDC by mail, FDOC staff also regularly sent an additional notice to HRDC via email. Facts, ¶ 71.

State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). Here, under *Overton* and *Thornburgh*, HRDC has failed to meet its burden to prove the invalidity of the ARM Rule as applied to its publications.

### a. Prong one of the *Turner* standard

Preventing inmates from soliciting for pen pals, using postage stamps as currency, running a business from prison, and using three-way calling services were found to be connected to legitimate penological interests of FDOC in several prior cases, including the litigation previously brought by HRDC. *See Prison Legal News*, 890 F.3d at 954, 975–76.[10] Further, as another Circuit has recognized, prison officials can act proactively to address a perceived threat to legitimate penological interests. *See Woods v. Commissioner of the Ind. Dep't of Corr.*, 652 F.3d 745, 751 (7th Cir. 2011) ("Here, the IDOC reasonably perceived that continuing to allow inmates to use the sites would passively enable fraud. The regulation enacted to prevent it squarely addressed the threat and is therefore constitutional."). Preventing, or at least reducing, these activities by inmates furthers FDOC's legitimate penological interests in protecting the public, FDOC staff, and inmates. In addition to the court in *Prison Legal News* specifically finding this connection with regard to similar, and sometimes identical, ads, the record before this Court clearly shows that FDOC's efforts to stop inmates from soliciting for pen pals, using stamps as currency, running a

---

[10] *See also Pell v. Procunier*, 417 U.S. 817, 823 (1974) ("[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves."); *Perry*, 664 F.3d at 1359 (affirming FDOC rule banning solicitation of pen pals by inmates and affirming FDOC's action of banning literature about pen pal services); *Prison Legal News v. McDonough*, 200 F. App'x 873, 877 (11th Cir. 2006) (FDOC rule prohibiting inmates from conducting a business in prison is rationally related to a legitimate interest); *Pope v. Hightower*, 101 F.3d 1382, 1385 (11th Cir. 1996) (stating that restrictions on inmates' telephone use was justified by the legitimate objective of reducing criminal activity and harassment); *Weeks v. McDonough*, No. 5:05cv100LAC/MD, 2006 WL 2682839 (N.D. Fla. Sept. 18, 2006) (finding valid interest regarding a rule which allows corrections officials to reject mail that solicits inmates to purchase products or services with stamps).

business from prison, engaging in three way calling, and otherwise violating FDOC rules are based on legitimate penological interests. Facts, ¶¶ 13, 15-17, 29-30, 33-34, 45, 47-49, 54-60, 64-65.[11] The Eleventh Circuit already has determined that the types of ads and content appearing in HRDC's publications at issue here are adverse to FDOC's legitimate penological interests, and as such granting HRDC's requested relief of delivering all of these publications to inmates would violate the previously acknowledged penological interests; thus, prong one of the *Turner* standard favors the Defendants.

### b. Prong two of the *Turner* standard

HRDC has alternative means to exercise its First Amendment rights, including through the sale to FDOC inmates of HRDC's other publications. Based on the facts of this case, the subject publications are not impounded in a vacuum, nor are the publications being rejected outright or even simply due to the presence of ads generally. The publications each were impounded or rejected based on specified ads or content which are adverse to the penological interests of FDOC as described in their impoundment notices. HRDC does not dispute that the ads are in its publications, indeed, HRDC itself places its own advertisements for sale of its books in exchange for an inmate providing new postage stamps as currency. HRDC only challenges whether the amount of ads satisfy the prior version of the ARM Rule's "prominent or prevalent" language. "Where, as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense

---

11 The only type of ad that was not specifically addressed in the *Prison Legal News* litigation is an ad for fantasy sports or gambling, Am Compl (ECF No. 39), ¶ 25. Although this type of ad was not specifically addressed by the court in the prior case, the findings of the court addressed ads which promoted violations of FDOC's rules or the law, generally. Subsection 15(e) of the ARM Rule prohibits inmates from receiving publications that encourage or facilitate gambling.  This prohibition is based on Fla. Admin. Code r. § 33-601.314(9-12) and Fla. Stat. § 849.08 that prohibit gambling; thus, FDOC has legitimate penological interests for this prohibition. Facts, ¶ 34.

in which we meant and used that term in *Turner*." *Thornburgh*, 490 U.S. at 415-16. HRDC has a variety of options here. It can focus on the sale of its many other publications that do not contain offending advertisements, including dictionaries, books of rules of federal procedure, *etc*., most of which presumably would be permitted to enter FDOC facilities under the ARM Rule. Facts, ¶ 62. *See Thornburgh*, 490 U.S. at 418 ("As the regulations at issue in the present case permit a broad range of publications to be sent, received, and read, this factor is clearly satisfied."). In light of HRDC's entire advertising revenue being only 10% of its revenue in recent years, and that includes income from its many advertisers for legal representation and other non-objectionable services or goods, HRDC could simply eliminate the offending advertising. Facts, ¶ 98. If HRDC is sincere in its statement that its content is more important than advertising, it can simply remove offending ads, including its own ads over which it has complete control.[12] Alternatively HRDC can remove the offending ads from publications sent to FDOC inmates (a small fraction of HRDC's total subscribers[13]), or could send alternate publications to FDOC inmates without the offending ads.[14] HRDC retains the right to promote anything it desires on its website and to its other subscribers not in FDOC custody. Defendants should not be required to admit publications which explicitly promote prohibited behaviors or would suggest to inmates that by FDOC allowing prisoners to possess the publication that such advertised behaviors are permitted by FDOC, particularly where

---

**12** In January 2020 HRDC stopped accepting postage stamps as payment in lieu of cash for its *DSHLM*, apparently because HRDC was shifting away from accepting postage stamps as currency. FDOC's General Counsel previously informed HRDC that *DSHLM* would be welcomed at FDOC if HRDC would simply remove its own ads near the back cover of the Manual so that they do not promote the purchase of *DSHLM* by using postage stamps as currency. HRDC has to this date refused to do so.
**13** HRDC only has approximately 45 subscribers among FDOC's 80,000 inmates and has not had more than 300 subscribers at FDOC at any time in the past fifteen years. Facts, ¶ 96.
**14** *See Perry*, 664 F.3d at 1359, 1366, accepting, under the second prong, FDOC's assertion that Writeaprisoner.com could send FDOC inmates literature regarding its non-pen pal services if Writeaprisoner.com clearly differentiated between the two.

it is undisputed that HRDC has other publications that it can sell to FDOC inmates, and thus the second prong of *Turner* favors Defendants.

    **c. Prong three of the *Turner* standard**

    As observed by then-Chief Judge Ed Carnes, "Prison officials have the duty to reduce the temptation for prisoners to commit more crimes and to curtail their access to the means of committing them." *Prison Legal News*, 890 F.3d at 957. If HRDC is permitted to send its publications to FDOC inmates with prohibited types of ads for prohibited activities, FDOC will have to expend substantial resources to reduce the temptation for its inmates to commit more crimes, given that inmates would be holding in their hands an instruction on how to do so.

    Allowing FDOC inmates to receive the subject publications in their current format would have a significant deleterious effect on FDOC's resources. As noted in *Perry v. Sec'y, Fla. Dep't of Corr.*, 664 F.3d 1359, 1366-67 (11th Cir. 2011), the extra burden to search for offending pen pal mailings alone would be significant. And those costs are even higher now that FDOC inmates are regularly using hacked tablets and contraband cellular devices to access the internet directly. Several years ago, an inmate using a pen pal solicitation service had to rely on regular mail to do so. Today the FDOC inmates advertising on writeaprisoner.com, including at least one who is a current HRDC subscriber, simply invite people to email them and send videos. Facts, ¶ 56. In addition, the costs to FDOC of hiring trained staff who can adequately monitor businesses that inmates attempt to operate from prison and the costs of intercepting and investigating the other types of prohibited activities that are the subject of the ads in the publications at issue here, would be substantial. Facts, ¶ 64.

    The law does not require FDOC to implement "costly" alternatives or alternatives which will have a negative "ripple effect" on inmates or prison staff. *Turner*, 482 U.S. at 90-91; *Hathcock*

*v. Cohen*, 287 F. App'x 793, 800 (11th Cir. 2008) ("Providing additional guards to supervise inmate-conducted religious services represents more than a *de minimis* cost."). If the Court requires the subject publications to be freely admitted into FDOC, significant resources would be needed to accomplish the vast and onerous task of monitoring a variety of electronic and print media, searching for inmates engaging in the illegal activities advertised in the publications, imposing discipline on inmates who engage in these activities, and attempting to seek restitution on behalf of members of the public who are harmed. Facts, ¶¶ 33, 49, 67-68. FDOC already allocates 64.8% of their 2.7-billion-dollar budget to security and is in the midst of a staffing crisis. Facts, ¶¶ 4, 9. HRDC's own Executive Director acknowledged that any staffing vacancy rate above 25% is high and it is undisputed that FDOC's vacancy rate is 31.17%. Facts, ¶¶ 4-5. The resulting burden of searching for and stopping these activities will require the shifting of correctional staff and inspectors away from accomplishing the numerous other responsibilities these personnel have in maintaining a safe and secure prison environment. Due to the staffing crisis, these diverted staff would not likely be replaced, thus creating increased security and safety risks for prison personnel and inmates alike.[15] Based on the undisputed facts, the third prong of the *Turner* standard favors Defendants.

### d. Prong four of the *Turner* standard

FDOC's ARM Rule is not an exaggerated response to prison concerns. The ARM Rule was structured to allow publishers to reach inmates even though occasional ads which are adverse to the penological objectives of FDOC may be present. Defendants have legitimate penological

---

[15] For example, when stamps are used as currency by inmates, weaker inmates and their families are often targeted by stronger inmates for extortion their stamps which, using the services advertised in the subject publications can be exchanged for actual currency, goods, and services. Facts, ¶¶ 59-60.

interests in stopping these activities and have repeatedly provided notice to HRDC of how the subject publications violate of the ARM Rule. Defendants' penological interests to prevent inmates from engaging in activities being advertised where those activities violate the rules of FDOC are clear. Allowing these ads to circulate among inmates implies that FDOC approves of the advertised services. Defendants' notifications to HRDC regarding the rationale for the rejection of the subject publications allow HRDC to address these issues instead of continuing to send the publications containing the same ads which HRDC knows are prohibited. FDOC has done more than required in the face of a threat to its legitimate penological interests. *See Perry*, 664 F.3d at 1367 ("Although the FDOC did not need to narrowly tailor its Rule to only prohibit inmates from soliciting for pen pals, the FDOC chose to use the least exaggerated response possible. The choice to permit inmates to still have pen pals shows that the FDOC rule is a well reasoned response to a significant problem."). The perceived threat from the services advertised in the subject publications are real and current and the Defendants are not required to respond in a merely reactive manner to meet these legitimate threats to FDOC's security interests. Accordingly, the ARM Rule is not an exaggerated response as the ads appearing in the subject publications clearly present threats to inmates and staff, and therefore the fourth prong of the *Turner* standard favors Defendants.

**2. FDOC's ARM Rule is neither vague nor overbroad**

In Counts II and III of its pleading, HRDC attempts to state a facial challenge, alleging that the ARM Rule, including as recently amended, is void for vagueness under the Fourteenth Amendment and is overbroad under the First and Fourteenth Amendments. According to HRDC, the amendment to the ARM Rule (initiated in 2021 and effective May 4, 2022) which removed language that HRDC for the past ten years has claimed was unclear, does not make the ARM Rule acceptable, because it is still paired with a "vague definition of inflammatory," Am. Compl.

(ECF No. 39), ¶ 81 and because no "reasonable reader" can determine the meaning and application of subsections 15(o) and 15(i), *id*., ¶¶ 37, 39.[16] HRDC alleges that the ARM Rule "allows the impoundment of materials in terms so vague as to necessitate that persons of common intelligence guess at their meanings and subsequently differ in their application" and that the language in the ARM Rule "is susceptible of no narrowing construction that would give HRDC guidance as to what speech it prohibited." *Id.,* ¶70-72. HRDC essentially claims that the language in the ARM Rule is too vague for FDOC officials or any person to understand.[17]

To succeed on a facial challenge under the First Amendment a party must demonstrate that "no set of circumstances exists" under which the challenged rule would be valid. *Horton v. City of St. Augustine, Fla*., 272 F.3d 1318, 1329 (11th Cir. 2001). The Eleventh Circuit has described this test as "an especially demanding standard." *Am. Fed'n of State, Cnty. & Mun. Emps Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013). "[C]ourts strongly disfavor facial challenges, and for good reason." *Id*., at 864. Even if HRDC's challenge is an as-applied challenge, it still fails because the words used in the ARM Rule until its recent amendment, and

---

[16] This is another example of HRDC's overstatement of the case: only <u>one</u> of its publications in the past five years was impounded under subsection 3(g) (now numbered 15(i)) as dangerously inflammatory. Facts, ¶ 38. Indeed, only two publications were initially impounded due to the content of an article, and each of those later was determined to be properly impounded for the alternative reason that the publication contained offending advertisements. Facts, ¶¶ 66, 91-92.

[17] While the Rule provides 16 specific reasons for which a publication may be impounded or rejected, HRDC focuses its claims on 4 subsections which resulted in the impoundments at issue: 15(e) which prohibits publications which "encourages, provides instructions on, or facilitates gambling"; 15(i) which prohibits publications that are "dangerously inflammatory in that it advocates or encourages riot, insurrection, rebellion, organized prison protest, disruption of the institution, or the violation of federal law, state law, or Department rules"; 15(o) which prohibits publications that contain ads which promote three-way calling services, pen pal services, the purchase of products or services with postage stamps, or conducting a business or profession while incarcerated; and 15(p) which prohibits publications that "otherwise presents a threat to the security, order, or rehabilitative objectives of the correctional system or the safety of any person." Consistent with the holding in *Thornburgh*, all of these paragraphs describe categories of publications that are "found potentially detrimental to order and security." 490 U.S. at 418.

after, are common words that are easily understood. In *Rectory Park v. City of Delray Beach, FL.*, 208 F. Supp. 2d 1320 (S.D. Fla. 2002), *aff'd* 82 F. App'x 221 (11th Cir. 2003), the court considered an "as-applied" challenge and found that in order to be void for vagueness a rule must be "so vague and indefinite as really to be no rule or standard at all." *Id.*, at 1331 (citation and internal quote omitted). The court held that since the city ordinance in question had "clear and definite standards, it will not be declared impermissibly vague just because the decision-maker has flexibility in applying the standards." *Id.* at 1334. Similarly, in *Torres v. Fla. Dep't of Corr.*, 742 F. App'x 403 (11th Cir. 2018), the court rejected an inmate plaintiff's claim that an FDOC rule was so vague that it was arbitrarily applied and enforced, and found that the subject rule was not vague because it fairly described what was prohibited and "articulates the nature of the prohibited materials." *Id.*, at 408. In *Pesci v. Budz*, 935 F.3d 1159, 1170-72 (11th Cir. 2019), the court found it was reasonable for officials to ban a monthly newsletter published by a civil commitment detainee that included "inflammatory rhetoric" and was a platform for lodging grievances and expressing political views on civil detention, generally, because the official believe that the publication "would have a negative impact on guards, staff, and other inmates." *Id.* "The First Amendment's neutrality requirement operates differently within prison walls; in many cases, 'what would obviously constitute content-based discrimination outside the prison context is undoubtedly permissible within it .'" *Id.,* at 1173, citing *Prison Legal News v. Livingston*, 683 F.3d 201, 218 n.6 (5th Cir. 2012). Another example of common terms with which the Court is surely familiar is "good faith." Determining whether parties or their counsel engaged in good faith conferral regarding their differences in the discovery process, for example, is not subject to a set of terms specifically defined. Instead, as Judge Paskay observed in *In re Noll*, 172 B.R. 122, 124 (Bankr. M.D. Fla. 1994), "[t]he term 'good faith' is not easily defined and the

requirement is not capable of pragmatic and mechanical application. In the last analysis it is the same as pornography, one cannot define it but will readily recognize it when one sees it." Citing *Jacobellis v. Ohio*, 378 U.S. 184 (1964) (Stewart, J., concurring).[18]

HRDC claims that nobody is able to understand the meaning of the words in the ARM Rule and therefore any decision based on the ARM Rule is arbitrary. The evidence demonstrates that HRDC is incorrect. The language in the ARM Rule specifically lists the content of ads which are not permitted in plain and unambiguous terms. FDOC also has established a procedure, Procedure 501.401, and conducted training for those responsible for reviewing incoming publications in compliance with the ARM Rule. Facts, ¶¶ 69-71. LRC members are tasked with independently reviewing each publication with a fresh perspective, based on their experience in the corrections setting, to ensure that the requirements of the ARM Rule are applied correctly and consistently, and they simply apply the plain meaning of the common terms in the ARM Rule. Facts, ¶¶ 75-76.

HRDC alleges that the ARM Rule "has no legitimate application because the only speech it censors threatens no legitimate state interest" and that the ARM Rule "equips the FDOC with unfettered discretion in impoundment with no limiting provision." Am. Compl. at ¶¶ 80-81. Defendants are entitled to summary judgment on this issue, which shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because HRDC bears the burden of proof on

---

**18** "[U]nder the First and Fourteenth Amendments criminal laws in this area are constitutionally limited to hard-core pornography. I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that." *Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964), Justice Stewart, concurring.

each of its claims at trial, Defendants here need only "[point] out to the district court - that there is an absence of evidence to support the nonmoving party's case." *Jackson v. Sara Lee Bakery Grp.*, 517 F. App'x 645 (11th Cir. 2011) (internal citations omitted). FDOC has presented multiple examples of the types of conduct that inmates engage in and that support the penological interests asserted as justification for the ARM Rule. Those interests have been upheld by multiple courts and are even more worthy of deference today. As outlined both by witness testimony and by the documentary evidence, FDOC inmates continue to advertise with pen pal solicitation services and some inmates who have met through such services have engaged in crimes or have themselves been near-victims of crimes. FDOC inmates also attempt to conduct businesses from their cell, utilize 3-way calling to frustrate FDOC's ability to track the inmates' communications, and use hacked tablets and contraband wireless technology to engage in gambling and also to coordinate gang-related activities or introduce contraband. HRDC's claim that there is no limiting provision is incorrect on its face based on the previously described limitations included in the ARM Rule describing in plain language the specific contents which will result in impoundment of a publication. Furthermore, the court in *Prison Legal News*, 890 F.3d at 972, specifically addressed the HRDC's claim noting that, if the ads are as dangerous as FDOC makes them out to be, then FDOC should impound a publication with even one suspect ad, by noting that FDOC could do just that under the standard set by *Thornburgh* which upheld the facial validity of a prison regulation that allowed a warden to reject a publication based on a single prohibited feature. HRDC never alleges, nor could it, that the subject publications did not contain ads or content which specifically meet the criteria of prohibited ads or content. HRDC claims without support that because there may be different interpretations of the plain meaning of terms, the entirety of the ARM Rule is so vague as to be unenforceable.

Finally, HRDC claims that the current version of the ARM Rule, which removed the "prominent or prevalent" language, still maintains the alleged ambiguity. Am. Compl. at ¶73. These conclusory allegations are unsupported by the evidence. In fact, HRDC's corporate representative suggested this change explicitly nine years ago when he was deposed in the prior litigation. Facts, ¶ 43. It is undisputed that each of the prohibited categories of ads are tied to another FDOC rule that prohibits that type of activity. If inmates engage in the services advertised, as the advertiser hopes they will do, the inmate will face discipline for the prohibited behavior and FDOC staff will face security risks of having a negative interaction with an inmate.

### 3.   HRDC is not entitled to relief as to either version of the ARM Rule

HRDC's attempt to receive retrospective relief from Defendants Dixon or Colon in their official capacities for the prior version of the ARM Rule is barred by the Eleventh Amendment which "bars suits against state officials in federal court seeking retrospective or compensatory relief, but does not generally prohibit suits seeking only prospective injunctive or declaratory relief." *Summit Med. Associates, P.C. v. Pryor*, 180 F.3d 1326, 1337 (11th Cir. 1999). Nor is there a basis for an action for prospective or declaratory relief against Defendants Dixon and Colon in their official capacities, because the *Ex Parte Young* doctrine, can only be applied to "ongoing and continuous violations of federal law." *Id*. In this case, the *Ex Parte Young* doctrine does not apply because there are no "ongoing and continuous" violations of federal law as FDOC applied the prior version of the ARM Rule carefully and with multiple levels of review, and HRDC received procedural due process. "Declaratory relief is not prospective as required by the *Ex Parte Young* doctrine when it would serve to declare only past actions in violation of federal law: retroactive declaratory relief cannot be properly characterized as prospective." *Taylor-Tillotson v. Fla. Dep't of Children & Families*, Case No. 12-81364-CIV, 2013 WL 6050968, at

\*4 (S.D. Fla. Nov. 14, 2013) (internal citations omitted). Because the 2021 amendment took effect last month and HRDC has no complaints about how that version of the ARM Rule has been applied to their recent publications, there is no basis for a finding that prospective relief is appropriate because there are no "ongoing and continuous violations" of federal law.

HRDC has failed to establish that Defendants Dixon or Colon took any specific acts that violate federal law, and instead merely claims that these two individuals "oversaw" others' actions, and there are no allegations that these Defendants adopted a policy that violates federal law. See *Rizzo v. Goode*, 423 U.S. 362. The Eleventh Circuit held that:

> Qualified immunity is a doctrine that focuses on the actual, on the specific, on the details of concrete cases. The most common error we encounter, as a reviewing court, occurs on this point: courts must not permit plaintiffs to discharge their burden by referring to general rules and to the violation of abstract "rights."…"If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir.1993), modified, 14 F.3d 583 (11th Cir.1994); *accord Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir.1994).

*Lassiter*, 28 F.3d at 1149-50. Indeed, Defendant Colon did not work at the location where he allegedly "oversaw" others' actions, so all claims against him should be dismissed with prejudice. [19] Nor was Defendant Colon the warden of Everglades C.I. at the time of the events alleged in HRDC's pleading.[20] Finally, even if Defendants Dixon or Colon had been shown to have engaged in something that would expose them to individual liability, they are protected by the doctrine of qualified immunity.

---

**19** See Am. Compl. (ECF No. 39), at ¶¶ 30-34, 59, and 88, which name Defendant Colon and refer to issues of *CLN* or *PLN* published in 2021, but he was only the Warden at Dade C.I. from April 2017 to December 2020. Facts, ¶ 7.

**20** See Am. Compl. (ECF No. 39) at ¶¶22, 23 & 56, regarding the claims, and at ¶¶29, 58-60, 87, 89 and ECF Nos. 39-4, 39-10, regarding the specifically rejected publications. Additionally, notice was previously received by HRDC regarding the publication described at ¶ 29, on September 17, 2020. Facts, ¶ 7.

Moreover, HRDC's claims for damages against now-former Secretary Inch and former Warden Colon in their individual capacities are barred by qualified immunity because their conduct was objectively reasonable and they did not violate clearly established law. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An official acting within the scope of his employment has qualified immunity "provided that the conduct was not 'so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed' the acts." *Crosby v. Paulk*, 187 F.3d 1339, 1344 (11th Cir. 1999). Qualified immunity is determined by an objective standard, and the official's intent and motivation are insignificant. *Id.* at 1344. A right is considered clearly established if, "in light of preexisting law, the unlawfulness of the official's conduct is 'apparent.'" *Cooper v. Dillon*, 403 F.3d 1208, 1220 (11th Cir. 2005). The law must ". . . dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Lassiter v. Ala. A&M Univ., Bd. of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994). Precedent must place the question "beyond debate." *al-Kidd*, 563 U.S. at 741.

HRDC fails to establish the violation of any right by Defendants Inch and Colon in their individual capacity, much less one that was clearly established since HRDC fails to meet the *Turner* standards. Even if HRDC could show that its rights were violated, there still would be no bright line case law establishing for all similarly situated officials how they *must* have responded to these facts. FDOC has a legitimate penological interest in rejecting the subject publications. *See Thornburgh*, 490 U.S. at 401, 407 (holding that prison officials have the difficult task of determining when seemingly innocuous interactions have potentially significant implications for the facility). Defendants have established that impoundments of the publications were done in

compliance with the rules and in the interest of reducing security risks.[21] Under these facts and not just abstract principles, Defendants could not be found to have created a ban on HRDC's speech by their actions in impounding publications based on specific penological interests which have been conveyed to HRDC. The Court need not accept that Defendants were fully correct, because it is only in "exceptional circumstances" that an official is deprived of qualified immunity. *Lassiter*, 28 F.3d at 1149. HRDC cannot meet this high burden, and Defendants are entitled to this immunity.

### B.  HRDC has received abundant procedural due process

As a publisher, HRDC is entitled to notice and opportunity to be heard when their publications are impounded by prison officials. *See Prison Legal News*, 890 F.3d at 954. FDOC's ARM Rule includes procedural due process provisions that meet the safeguards provided each time an item of mail is intercepted by prison officials: (1) the inmate must be notified; (2) the sender must be given a reasonable opportunity to protest the decision; and (3) any complaints must be referred to a prison official other than the person who originally disapproved of the correspondence. *Procunier v. Martinez*, 416 at 418-419 U.S. 396 (1974); *see also Perry*, 664 F.3d at 1368. HRDC does not challenge the procedures in the ARM Rule, nor should they, since the Eleventh Circuit has approved those procedures.  *See Prison Legal News*, 890 F.3d at 976. The FDOC inspection and impoundment protocol consists of a review of the publication followed by notice to both the inmate and publisher of an impoundment decision listing the reasons for impoundment. While the requirement of notifying the inmate applies regardless of whether the impounded publication has been rejected before, due process mandates just one notice be sent to

---

**21** In contrast HRDC only claims, without evidentiary support, that the rationale for these heavily documented decisions was actually "due to [Florida Department of Corrections (FDOC)] officials' disagreement with the content of those publications" and that Defendants used the rules to "censor speech they disfavor politically." Am. Compl. (ECF No. 39), ¶¶ 64, 71.

the publisher. *See Prison Legal News*, 890 F.3d at 976 (citing *Prison Legal News v. Livingston*, 683 F.3d 201, 223-24 (5th Cir. 2012) ("After a DRC-level denial has become final, *subsequent* denials of identical publications amount to the routine enforcement of a rule with general applicability. Such subsequent denials are non-individualized—they neither reconsider the content of the denied book nor depend on the particular sender or addressee—so it is not even clear that due process is implicated by such decisions") (emphasis in original)).

Here, the ARM rule, at sections (5) and (8)(b), requires written notice to each "publisher" of an impounded publication. Additionally, the ARM Rule affords HRDC an opportunity to contest the decision. Thus, the second prong of *Procunier* and basic requirements of due process are satisfied. Once the required notices are sent, the final step is review by the LRC, whose decisions are final and provides procedural due process to safeguard the rights of publishers and inmates. *Mathews v. Jones*, No. 4:16CV375-RH/CAS, 2019 WL 3976572, at *8 (N.D. Fla. July 3, 2019).

HRDC claims to have been denied the notice they were entitled to receive, but again its allegations do not match the facts that were in HRDC's possession at the time it filed this lawsuit. Since August 2017, 58 issues of PLN have been impounded by FDOC.[22] Starting with the first edition of *CLN* in December 2017, 52 issues of *CLN* were impounded. Additionally, the *Disciplinary Self-Help Litigation Manual* (*DSHLM*) sent by HRDC was impounded. Out of these 111 impoundments, HRDC claims to have not received notice of only 10 impoundments: the May 2018, March 2019, and May 2020 issues of *PLN*; the April 2019, May 2019, November 2019, October 2020, December 2020, May 2021, and June 2021 issues of *CLN*.  HRDC apparently did

---

[22] The parties agree that the statute of limitations is four years. *See, e.g.*, *Crowe v. Donald*, 528 F.3d 1290, 1292 (11th Cir. 2008) (constitutional claims brought under Section 1983 are tort actions, subject to the statute of limitations governing personal injury actions in the state where the action is brought). "In Florida, the statute of limitations for a Section 1983 suit is four years." *USA Ent. Grp., Inc. v. Tony*, 847 F. App'x 642, 646 (11th Cir. 2021).

not review its own production to FDOC in this case since they produced copies of four notices they claimed to not have received: *PLN* May 2018, *PLN* March 2019, *CLN* April 2019, and *CLN* May 2019. Facts, ¶¶ 72-73. Further, the November 2019 and May 2021 issues of *CLN* were admitted when they first arrived at an FDOC facility, therefore no notice of impoundment was required or issued. Facts, ¶ 73. Of the remaining four issues HRDC claimed not to receive notices for, according to FDOC records and declarations by prison officials with knowledge, notices were sent to HRDC upon the first impoundments of: PLN May 2020, *CLN* October 2020, *CLN* December 2020, *CLN* June 2021. Facts, 73. As to the *DSHLM* publication, HRDC included a Notice (ECF No. 39-5) with its pleading that shows that the notice was sent to HRDC on the date of the "mailed" stamp. Facts, ¶ 73. Therefore, out of the 111 impoundment events, HRDC received notice and opportunity to be heard every time. HRDC cannot dispute that it received at least 107 of these notices based on its own records. Even if HRDC never received the other four notices sent by FDOC, that is only a 3.6% failure rate. HRDC's claim that Defendants violated the due process protections are barred because the Due Process Clause is not implicated by acts that were negligent. *Daniels v. Williams*, 474 U.S. 327, 328 (1986). A constitutional violation may not be based on a prison official's failure to adhere to rules, policies, or procedures established by FDOC. *Jordan v. Colon*, No. 2:09-CV-177-FTM-36, 2012 WL 394472, at *4 (M.D. Fla. Feb. 7, 2012).

A claim for violation of procedural due process brought under Section 1983 is barred when an adequate post-deprivation remedy is provided by state law. *Lakoskey v. Floro*, No. 19-12401, 2021 WL 5860460, at *4 (11th Cir. Dec. 10, 2021). HRDC had an opportunity to seek review of decisions impounding their publications, which demonstrates that an adequate and meaningful post-deprivation remedy exists under state law regardless of whether HRDC decided to pursue that

review. In the prior litigation HRDC complained that FDOC's failure to provide notice of the impoundments had prevented HRDC from being able to appeal or engage in an administrative challenge to the ARM Rule but today, having received more than 100 notices in the past 5 years, HRDC has never engaged in the administrative process nor sought a proper appeal under the ARM Rule, instead seeking a personal meeting with the chief executive of the State's largest agency.

Finally, HRDC claims it was denied procedural due process because it sought a "publisher's review" under the ARM Rule in April 2020, that was denied in April 2021. HRDC ignores the facts underlying their purported request for a "publisher's review." The letter sent by HRDC in April 2020 did not comply with the ARM Rule's directives because it was not addressed to the proper party. Facts, ¶ 87. This informal message was sent only by email to FDOC's General Counsel and was never sent to the Secretary for review.[23] On March 3, 2021, HRDC sent a certified letter to the Secretary, which also failed to comply with the procedures in the ARM Rule; in that letter HRDC protested the impoundment of its publications and attached a copy of the April 2020 letter. Facts, ¶ 87. The March 2021 letter was received and signed for by staff in FDOC's Citizens Services office and forwarded to the Library Services Administrator (to whom the letter should have been addressed), Dean Peterson, who died of COVID-19 shortly after receiving the letter and it remained on his desk until FDOC's new Library Services Administrator, Charles Huber, discovered it in mid-April 2021. Facts, ¶ 88. Mr. Huber, without consulting with the Secretary or the General Counsel, responded to HRDC on April 19, 2021, informing HRDC it was too late to conduct a publisher's review of the April 2020 issue of PLN. Facts, ¶ 88. HRDC's Executive Director wrote directly to FDOC's Secretary in the middle of the night in mid-February 2020 to

---

[23] The record shows that FDOC impounded the April 2020 issue of *PLN* and notified HRDC at that time. Facts, ¶ 72.

request an in-person meeting to discuss FDOC's rejection of HRDC's publications. Two months later, when the meeting was delayed due to COVID-19, HRDC's General Counsel wrote directly and only to FDOC's then-General Counsel seeking to have HRDC's publications deemed admissible into FDOC prisons. Although a response to that communication was not received by HRDC, they waited until March 2021 to contact then-Secretary Inch and then nothing further was sent from HRDC until after they filed this lawsuit on August 10, 2021. After HRDC filed this lawsuit, Secretary Inch requested that the LRC conduct a full special level review of the impoundments for every issue of *PLN* and *CLN* between December 2017 and September 2021. The LRC individually reviewed each of these publications and found that "each and every edition of *PLN* and each and every edition of *CLN* [between Dec. 2017 and Sept. 2021] should be rejected from entry into FDC institutions and facilities [since they] violate Rule 33-501.401(15)(O) and/or Rule 33-501.401(15)(P)." Facts, ¶ 92.

### C.  HRDC's damages claims lack a factual basis and should be stricken

Even if HRDC had established that Defendants Inch and Colon had engaged in some type of conduct that rendered them individually liable[24], and even if the Court failed to find that Defendants were entitled to qualified immunity, there is still no basis for an award of damages.[25] HRDC revenue has increased during the relevant period to the point that HRDC's Executive

---

**24** See *Rizzo*, 423 U.S. at 371 finding no affirmative link between the subject incidents and the adoption of any plan or policy because "the sole causal connection found by the District Court between petitioners and the individual respondents was that in the absence of a change in police disciplinary procedures, the incidents were likely to continue to occur, not with respect to them, but as to the members of the classes they represented." HRDC cannot show a causal link since Defendant Colon was not at the facilities in question when the publications were impounded and Defendant Inch was not involved in any of the decisions to impound or reject the publications.
**25** Furthermore HRDC's demand for punitive damages is solely based on the alleged violation of an injunction regarding notice given to HRDC for impoundments of the *PLN* newsletter, and there is only one issue of *PLN* as to which HRDC says it didn't get notice. Such allegation falls far short of supporting a claim for punitive damages

Director gave himself a 35% raise this year. HRDC obtained a COVID-19-related federal loan in excess of $160,000 in 2020 which presumably compensated HRDC for any losses, which was ultimately forgiven, despite HRDC declaring to its readership that it doesn't accept federal grants or loans. Facts, ¶ 96. HRDC's FDOC inmate subscribers to *CLN* are only increasing and HRDC continues to successfully raise donations and contributions of hundreds of thousands of dollars annually, which subjects HRDC to Florida law on charitable solicitation activities, including a grant which specifically allowed HRDC to offer its publications at no cost to new subscribers during the COVID-19 pandemic. Facts, ¶¶ 96, 98. Finally, HRDC failed to comply with its discovery obligations regarding its alleged basis for damages and that is additional support for the denial of any damages award.

<u>**CONCLUSION**</u>

The material facts as to each of HRDC's claims are undisputed. HRDC is unable to establish the necessary elements of their claim that Defendants violated the First and Fourteenth Amendments. There is no basis for an award of damages of any type, and particularly not punitive damages, nor is there a basis for declaratory or injunctive relief. The undisputed facts show that Defendants had and continue to have a legitimate penological interest in rejecting the subject publications because they contain ads or content that is banned under the ARM Rule. The undisputed facts also show that Defendants provided notice to HRDC each time a publication was first impounded (96.5% of which HRDC admits it received), the LRC reviewed each impoundment, and the ARM Rule governing this process was neither vague nor overbroad in its prior or current edition.

WHEREFORE, Defendants respectfully requests that the Court enter summary judgment in their favor on all claims.

Respectfully Submitted,

ASHLEY BROOKE MOODY
FLORIDA ATTORNEY GENERAL

Barbara Junge_____
BARBARA JUNGE
Chief Assistant Attorney General
Fla. Bar No: 993270
OFFICE OF THE ATTORNEY GENERAL
110 S.E. 6th Street, 10th Floor
Ft. Lauderdale, Florida 33301
Telephone:      954-712-4600
Facsimile:      954-527-3702
Barbara.Junge@myfloridalegal.com

CHRISTOPHER KONDZIELA
Assistant Attorney General
Fla. Bar No: 125255
Christopher.Kondziela@myfloridalegal.com

Attorneys for Defendants: Ricky D. Dixon
Mark S. Inch, and Jose Colon

## CERTIFICATE OF FILING

PURSUANT TO Rule 5(d)(1)(B) of the Federal Rules of Civil Procedure, Local Rule 5.1(b), S.D. Fla. L.R., and Section 3.K.(4) of the CM/ECF Administrative Procedures of the Southern District of Florida, I hereby certify that on June 23, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will generate a Notice of Electronic Filing to all counsel of record.

Barbara Junge_____
BARBARA JUNGE
Chief Assistant Attorney General